# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **REUBEN DOBSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:05-cv-0521** |
| | ) | **Judge Trauger** |
| **CITY OF GALLATIN, et al.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendants, the City of Gallatin and Police Chief John Tisdale (Docket No. 16), to which plaintiff Reuben Dobson has responded (Docket No. 34), and the defendants have replied (Docket No. 39). For the reasons discussed herein, the defendants' motion will be granted in part and denied in part.

## FACTUAL BACKGROUND and PROCEDURAL HISTORY

Plaintiff Reuben Dobson worked as a patrol officer for the Gallatin, Tennessee Police Department from October 1999 until his termination in August 2004.[1] His performance evaluations during that time reflect acceptable to commendable ratings. (*See* Docket No. 29 at 2-3.) According to the defendants, the plaintiff's performance as an officer began to decline in the last two years of his service. (*See id.* at 10.) The plaintiff claims that the defendants'

---

[1]Unless otherwise noted, the facts have been drawn from Plaintiff Reuben Dobson's Response to the Defendants' Statement of Undisputed Material Facts (Docket No. 36) and Plaintiff's Response to Defendants' Motion for Summary Judgment (Docket No. 34).

1

discrimination against him started after John Tisdale became Gallatin's Chief of Police in February 2004 and that its retaliation against him followed close behind.

Soon after Chief Tisdale started working for the city, a city judge informed him that the plaintiff frequently failed to attend his scheduled appearances in her court. Tisdales's subsequent investigation revealed that the plaintiff had missed twenty-one court dates during the previous two years and had not notified the court in advance about any of his absences. 133 cases had been scheduled for prosecution on those dates.

At a March 16, 2004 departmental hearing on this issue, the plaintiff testified that he had missed his court appearances because he "took it personal [when,] on several occasions . . . [he] went in[to court, because his] tickets were dismissed, things of that nature, [and] it became kinda frustrating to [him], and so . . . it . . . made [him] a little uneasy about going." (*See* Docket No. 36 ¶ 25.) The defendants claim that three days after the hearing, Chief Tisdale notified the plaintiff that, because of this incident and his prior disciplinary record with respect to court appearances, he would be suspended without pay for fifteen days. The plaintiff attempted to appeal this decision through internal processes, but his attempt was untimely. On May 26, 2004, he filed a charge of discrimination with the EEOC, alleging that his suspension qualified as racial discrimination.

On April 14, 2004, the plaintiff responded to a traffic accident at which one of the involved vehicles was no longer present. He was able to obtain that vehicle's license plate number and, acting in a manner that, he claims, was consistent with departmental policy and practice, he listed on his accident report that the owner of the vehicle was its driver at the time of the accident.

2

The plaintiff claims that he later went to the vehicle owner's home, where he confirmed (1) that a vehicle matching the unidentified vehicle's description belonged to the owner of the residence; and (2) that the individual who was listed as the vehicle's owner lived in that residence. No one was at home at the time of the plaintiff's visit, however, so the plaintiff was unable to complete his accident report. He claims that he asked another officer to investigate further, but he acknowledges that that officer was unable to obtain any more information as to the driver of the vehicle. The plaintiff also alleges that he advised his supervisor of the problems he encountered with identifying the driver when he turned in the accident report.

On April 26, 2004, Chief Tisdale ordered a review of this incident. This review indicated that the vehicle owner's daughter was, in fact, the driver involved in the accident. (*See* Docket No. 25 at 6.) It also determined that the daughter had left two voicemail messages, which identified herself as the driver, for the plaintiff in the days following the accident, but that he had never called her back. (*See id.*) After determining that the plaintiff had potentially violated a number of policies when he filled out the accident report, Tisdale decided to hold a departmental hearing about the matter.

The plaintiff was represented by his attorney at this hearing, which took place on June 8, 2004. During the hearing, the plaintiff admitted that he had not verified that the vehicle's owner was the driver involved in the accident when he listed such on his report. He also testified that he never received the two messages left for him by the owner's daughter, although he did not deny their existence. Chief Tisdale ultimately issued the plaintiff a written reprimand for this incident. The plaintiff wrote a letter for inclusion in his personnel file that noted his objection to the reprimand.

3

On July 3, 2004, the plaintiff called his shift supervisor and advised him that he would not be attending work that day because he was sick. Two days earlier, the plaintiff had seen his physician, who had instructed him not to attend work for the next three days due to his elevated blood pressure. According to the plaintiff, his physician "did not want [him] to be performing the functions of a police officer given the dangerous and stressful nature of the work in light of his medical condition [hypertension]."

Rather than attending work on July 3, the plaintiff participated in physical agility testing conducted by the Metropolitan Nashville Police Department in connection with its lateral transfer program. Another Gallatin officer, Walter Gray, also called in sick that day and participated in the testing alongside the plaintiff. Notably, Gray had not been instructed by a physician that he should not report to work.

Upon noticing that both the plaintiff and Officer Gray called in sick on the same date, one member of the Gallatin Police Department instructed another member to drive to Nashville to determine whether the two men were, in fact, participating in the Nashville Police Department's testing. That employee videotaped the plaintiff and Gray taking the test.

After being apprised of the situation, Chief Tisdale instructed two of his employees to conduct another internal investigation. The plaintiff was represented by his attorney during the interview he underwent pursuant to this investigation. He claims that he told his interviewer, Captain Dennis Thrasher, that he had been under a doctor's care on July 3 and had been instructed by his doctor not to report to work. He also asserts that he offered to retrieve from his car his doctor's statement to that effect, but that Thrasher declined his offer. The plaintiff admits that he would not discuss with Thrasher his actual whereabouts on July 3. The defendant notes

4

that Officer Gray readily admitted that he had participated in the testing. (*See* Docket No. 25 at 8.)

The investigation ultimately led the defendants to issue a written reprimand to Officer Gray and to hold a departmental hearing about the plaintiff's behavior. The plaintiff was notified of this hearing on July 27, 2004, and it took place on August 9, 2004. (*See* Docket No. 25 at 9.) After participating in this hearing and reviewing both the internal investigation file regarding this incident and the plaintiff's employment record, Chief Tisdale decided to fire him.

The defendants claim that the plaintiff's termination resulted primarily from his violation of the following policies: (1) Personnel Rule XVI 3.15, which prohibits abusing sick leave or making misleading statements about it; (2) Gallatin Police Department Directive 3.3.1, which states that an employee who is unable to report to work due to illness or other emergency should contact his supervisor at least two hours before his shift is scheduled to begin; and (3) Gallatin Police Department Directive 3.4.2, which requires all employees to answer all questions related to their scope of employment and to the police department's operations. (*See* Docket No. 25 at 9-10; Docket No. 28 at 1.)

The plaintiff was notified of his termination on August 30, 2004. He claims that the defendants then "attempted to do everything [they] could to sabotage Mr. Dobson and his ability to obtain any other employment in law enforcement" because they "went out of [their] way to characterize Mr. Dobson in a negative light to [pro]spective employers," despite the fact that he had "four years of a generally productive and acceptable career." (*See* Docket No. 34 at 19.)

The plaintiff appealed his termination to the City of Gallatin's Personnel Board. After a September 29, 2004 hearing, at which the plaintiff was represented by an attorney, the Board

5

overruled Chief Tisdale's decision to terminate the plaintiff and reduced his punishment to a thirty-day suspension without pay. Chief Tisdale appealed this decision to the Gallatin City Council.

The initial City Council hearing on this matter was scheduled for October 26, 2004, but the parties agreed to move the hearing to November 9, 2004. They did so, in part, to allow the plaintiff to obtain from his physician a statement regarding (1) the precise medical reasons behind his recommendation to the plaintiff that he not attend work from July 1 to July 3, 2004; and (2) whether the plaintiff's participation in the Nashville Police Department's testing was inconsistent with his doctor's orders.

The hearing took place, as scheduled, on November 9, 2004, but both the plaintiff and his attorney failed to appear. The City Council members considered the information put before them by the City and listened to the presentation of the City Attorney. They then voted unanimously to overturn the Personnel Board's decision and to reinstate the plaintiff's termination.

The day after the hearing, the plaintiff's attorney forwarded to the City Attorney an affidavit from the plaintiff's treating physician. This document details the reasons for the physician's advice to the plaintiff that he not work until July 4, 2004. (*See* Docket No. 35 at 1.) It also explicitly notes that the plaintiff obtained his physician's approval to attend the Nashville testing session. (*See id.*) The City Attorney explained to the plaintiff's attorney that the City Council would need to vote to reopen the matter in order to consider this new evidence. The plaintiff's attorney requested this of the City Council members at their next scheduled meeting, but they declined his request.

As indicated above, the plaintiff filed a charge of discrimination with the EEOC on May

6, 2004. In this charge, he alleged that he had been "harassed, suspended and denied promotions" because of his minority status. (*See* Docket No. 1 at 9.) He has submitted two notices of his right to sue, one issued by the EEOC on June 13, 2005, and the other on June 15, 2005. (*See id.* at 10-11.) He filed his Complaint in this court on July 1, 2005.

## ANALYSIS

The plaintiff complains that the defendants subjected him to racial discrimination, retaliation, and a hostile work environment. (*See* Docket No. 1 ¶¶ 22-27.) He brings these claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2000), and the Tennessee Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101, *et seq.* (2005).[2] The defendants have moved for summary judgment on each of the plaintiff's claims.

### I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S.

_____

[2]The plaintiff originally claimed that the defendants violated Section 1981 by "refusing to contract with [him] because of his race and color." (*See* Docket No. 1 ¶ 29); *see also* 42 U.S.C. § 1981 (2000). He subsequently withdrew this claim. (*See* Docket No. 34 at 25 ("To the extent that no court has changed the burden[,] the plaintiff does not pursue a claim under 42 U.S.C. § 1981 against these [d]efendants.").)

7

317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at

8

247-49).  With this standard in mind, the court turns to an analysis of the plaintiff's claims.

**II.      Two of the plaintiff's claims fail to meet THRA timeliness requirements.**

As noted above, the plaintiff brings his claims under both Title VII and the THRA. Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," the analysis of claims under the THRA is the same as under Title VII. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (citing Tenn. Code. Ann. § 4-21-101(a)(1)); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001).  Accordingly, the analysis of the plaintiff's Title VII claims will also apply to his THRA claims.

The two statutes, however, do have different timeliness requirements.  The defendants do not contest the plaintiff's timeliness under Title VII, but they assert that "any alleged discrete adverse employer actions or episodes of racial harassment that occurred prior to July 1, 2004 . . . are not actionable under the THRA."  (*See* Docket No. 25 at 13.)

A plaintiff must bring his claim under the THRA "within one year after the alleged discriminatory period ceases."  *See* Tenn. Code. Ann. § 4-21-311(d).  The plaintiff filed his Complaint in this court on July 1, 2005, thus allowing for timely claims dating back to, as the defendants correctly state, July 1, 2004.  (*See* Docket No. 1.)  Accordingly, because the plaintiff was notified of his fifteen-day suspension on March 19, 2004 and reprimanded for his allegedly false traffic report on approximately June 8, 2004, these actions cannot stand under the THRA.[3]

---

[3]The plaintiff himself recognizes that his suspension is not actionable under the THRA. (*See* Docket No. 34 at 16 n.2.)

9

The court will consider them, however, under Title VII.

### III. The defendants are entitled to summary judgment on all of the plaintiff's racial discrimination claims.

The plaintiff claims that the defendants discriminated against him on the basis of race when they (1) suspended him without pay for fifteen days due to his sparse attendance in city court; (2) reprimanded him for allegedly submitting a false traffic report; (3) terminated him after an incident in which he allegedly falsely called in sick; and (4) purportedly sabotaged his efforts to obtain other employment in law enforcement by issuing him negative employment references.  (*See* Docket No. 1 ¶ 23; Docket No. 34 at 19.)

To make out a claim of disparate treatment on the basis of race, as the plaintiff seeks to do here, a plaintiff may either present direct evidence of discrimination or adduce circumstantial evidence to create an inference of discrimination under the *McDonnell Douglas* burden-shifting approach.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246–47 (6th Cir. 1995)).  Because the plaintiff here presents no direct evidence in support of his claims, *McDonnell Douglas* analysis is appropriate.

Under this analysis, a plaintiff first must establish a *prima facie* case of discrimination.  *See McDonnell Douglas Corp.*, 411 U.S. at 802;  *Clayton*, 281 F.3d at 610.  A plaintiff fulfills this requirement when he demonstrates that (1) he is a member of a protected class; (2) he was subjected to an adverse employment decision; (3) he was qualified for the position that is the focus of his complaint; and (4) he was either replaced by a person outside of his protected class or treated less favorably than a similarly situated, non-protected employee.  *See Clayton*, 281

10

F.3d at 610; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992); *see also Burdine*, 450 U.S. at 254 n.6; *McDonnell Douglas Corp.*, 411 U.S. at 802.

The fourth prong is most important to the court's analysis of the case at hand, as it proves dispositive to each of the plaintiff's discrimination claims. To fulfill this prong's requirement, the plaintiff must show that he was treated less favorably than a non-protected individual in each of the four situations about which he complains. *See Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 731 (6th Cir. 2000). He fails to do so in each situation.[4]

A. ***The plaintiff has failed to indicate a similarly situated, non-protected comparator who was treated more favorably than he was with respect to his fifteen-day suspension.***

As indicated above, the plaintiff first complains that the defendants discriminated against him by suspending him without pay for fifteen days. (*See* Docket No. 1 ¶ 23; Docket No. 34 at 16-18.) Although he alleges generally that Chief Tisdale "took absolutely no disciplinary action against any other employee who had missed court dates in city court during that same time period," he explicitly acknowledges the defendants' recognition that he has not identified any

---

[4]The charge of discrimination that the plaintiff filed with the EEOC and submitted to this court complains only of generalized harassment, the denial of promotions that are not at issue here, and his fifteen-day suspension. In other words, it does not mention any discrimination based on the reprimand he received, the negative employment references he alleges, or his ultimate termination. Although the defendants do not mention such in their pleadings, this may raise issues of administrative exhaustion. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (noting that federal courts have jurisdiction to hear a Title VII claim only if the claimant explicitly has filed that claim in an EEOC charge or if his claim reasonably can be expected to grow out of his EEOC complaint); *see also Tisdale v. Federal Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005). The court need not address this issue here, however, because it is granting the defendants' motion for summary judgment on these discrimination claims. Notably, retaliation claims generally are exempted from the EEOC filing requirement because they tend to arise after a claimant has filed her EEOC charge. *Abeita*, 159 F.3d at 254.

11

similarly situated, non-protected comparators.  (*See* Docket No. 34 at 17-18.)  As emphasized by the defendants, the demonstration of a similarly situated comparator is a necessary component of the plaintiff's *prima facie* case.  (*See* Docket No. 25 at 16); *see also Clayton*, 281 F.3d at 610. The plaintiff has not made this demonstration and, therefore, his claim must fail.  *See Clayton*, 281 F.3d at 611 (noting that "it is fundamental that[,] to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated in all respects") (internal quotation and emphasis omitted).

> **B.      The plaintiff has failed to indicate a similarly situated, non-protected comparator who was treated more favorably than he was with respect to the reprimand that he received for allegedly submitting a false accident report.**

The plaintiff never attempts to put forth a similarly situated, non-protected comparator who committed actions similar to his submission of an allegedly false accident report but suffered less severe results.  Thus, even if a letter of reprimand qualified as an adverse action, which it does not, the plaintiff has not shown that the defendants discriminated against him when they issued him such a letter after he submitted the report.  *See Handshoe v. Mercy Med. Ctr.*, 34 Fed. App'x 441, 447 (6th Cir. 2002) (finding that "write-ups" and counseling memoranda did not amount to materially adverse actions for the purposes of a plaintiff's Title VII claim); *Clayton*, 281 F.3d at 610.

> **C.      The plaintiff has failed to indicate a similarly situated, non-protected comparator who was treated more favorably than he was with respect to his termination.**

12

As with the plaintiff's other discrimination complaints, he fails to list a similarly situated, non-protected comparator for the purposes of demonstrating that he was discriminated against when he was terminated following an incident in which he allegedly falsely called in sick. He does point to Officer Gray, another officer who called in sick on the same day as the plaintiff in order to attend the same testing session, as a comparator who was treated more favorably than he was. Even the plaintiff recognizes, however, that Officer Gray is, like the plaintiff, African-American. (*See* Docket No. 36 ¶ 55 ("Officer Gray is also an African American.").)

*McDonnell Douglas* and its progeny clearly require a demonstration that preferred treatment was given to a non-minority employee. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Mitchell*, 964 F.2d at 583. As an African-American, Officer Gray qualifies as a minority who is in the same protected class as the plaintiff. The plaintiff cannot, therefore, use him to demonstrate that a similarly situated, non-protected comparator was treated more favorably than he was. *See Mitchell*, 964 F.2d at 583. Because the plaintiff has not listed any other individuals who qualify as non-protected comparators, he cannot make out a *prima facie* case of discrimination with respect to his termination.

     **D.**    ***The plaintiff has failed to indicate a similarly situated, non-protected comparator who was treated more favorably than he was with respect to the defendants' issuance of negative employment references to his prospective employers.***

The plaintiff also fails to list a similarly situated, non-protected comparator whose prospective employers were not given the same negative employment references as his were.[5] Because the demonstration of such a comparator is, as discussed above, a necessary component of the plaintiff's *prima facie* discrimination action, this claim, too, must fail.

**IV.    While the defendants are entitled to summary judgment on the plaintiff's claims that they retaliated against him when they reprimanded him and negatively characterized him to prospective employers, a genuine issue of material fact exists as to whether the plaintiff's termination was retaliatory.**

The plaintiff claims that the defendants retaliated against him for his May 6, 4004 filing of an EEOC discrimination charge when they (1) terminated him for allegedly calling in sick; (2) reprimanded him for allegedly submitting a false traffic report; and (3) issued negative employment references to his prospective employers.  (See Docket No. 1 ¶ 23; Docket No. 34 at 19.)

To establish a *prima facie* case of unlawful retaliation, the plaintiff must demonstrate by a preponderance of the evidence that: 1) he engaged in activity that Title VII protects; 2) the defendants knew that he engaged in this protected activity; 3) the defendants took an employment action against him that a reasonable employee would have found to be materially adverse; and 4) a causal connection exists between the protected activity and the adverse employment action.  *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir.

_____

[5]Although the plaintiff does mention these negative employment references in his Complaint, he fails to list a cause of action that is specifically related to them.  (*See* Docket No. 1 ¶ 16.)  His Response to Defendants' Motion for Summary Judgment does not clearly indicate whether he seeks to state a discrimination claim based on these facts.  (*See* Docket No. 34 at 19.)  This point is mooted, however, by the fact that any such claim would fail for lack of a similarly situated comparator.

2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-15 (2006)).

"The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

After the plaintiff has proved the existence of his *prima facie* case, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the adverse action. *Nguyen*, 229 F.3d at 562. If the defendants meet this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the reason (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *See Abbott,* 348 F.3d at 542. The plaintiff bears the burden of persuasion throughout the entire *McDonnell Douglas* framework. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993).

**A.** ***A genuine issue of material fact exists as to whether the plaintiff's termination qualifies as retaliation.***

1. *The plaintiff has met his burden of demonstrating a* prima facie *case of discrimination.*

The defendants contest only the fourth, causal connection prong of the plaintiff's *prima facie* claim that they, acting through Chief Tisdale, terminated him in retaliation for his protected EEOC activity. (*See* Docket No. 25 at 20.) As such, the court will focus its analysis there.

A plaintiff demonstrates a causal connection between his protected activity and the adverse employment action he faced when he produces evidence from which one could conclude that the latter would not have occurred but for the former. *See Nguyen*, 229 F.3d at 563. Although no one factor is dispositive in establishing a causal connection, the Sixth Circuit has

15

found that evidence that a defendant treated a plaintiff differently from similarly situated employees or that an adverse action was taken shortly after a plaintiff's exercise of protected rights is relevant to causation. *See id.*; *see also Randolph*, 453 F.3d at 737 ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Steiner v. Henderson*, 121 Fed. App'x 622, 626 (6th Cir. 2005) (noting that, while some previous Sixth Circuit cases may arguably have held that temporal proximity alone is always sufficient to demonstrate a causal connection, "this cannot be the law of this Circuit" and emphasizing that "temporal proximity alone can be sufficient to support such an inference only when there is no compelling evidence to the contrary").

In this case, the close temporal proximity between the plaintiff's protected activity and his termination helps to create a genuine issue of material fact as to the existence of a causal connection. The plaintiff filed his complaint of discrimination with the EEOC on May 6, 2004. Approximately two months later, Chief Tisdale instructed two of his staff members to investigate a July 3, 2004 incident in which the plaintiff and another officer, Walter Gray, had called in sick to work but then participated in physical agility testing conducted by the Metropolitan Nashville Police Department in connection with its lateral transfer program. Notably, while the plaintiff had been instructed by his doctor not to attend work that day, Officer Gray had no such excuse.

The investigation ultimately led the defendants to issue a written reprimand to Officer Gray and to hold a departmental hearing about the plaintiff's behavior. The plaintiff was notified of this hearing on July 27, 2004, and it took place on August 9, 2004. (*See* Docket No. 25 at 9.) After participating in this hearing and reviewing the plaintiff's employment record,

Chief Tisdale decided to fire him. The plaintiff was notified of his termination on August 30, 2004. Thus, approximately three months elapsed between the plaintiff's protected EEOC activity and the hearing that led to his termination, and less than four months passed between the activity and his actual firing. This short time span helps to raise an inference of retaliation. *See Singfield v. Akron Metro Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of just over three months sufficed to show a causal connection).

Also relevant to a causal connection analysis are other indices of retaliation, such as, among other things, whether the plaintiff was treated differently than similarly situated counterparts who did not engage in protected activity. *See Cantrell v. Nissan Motor Corp.*, No. 3:03-0082, 2006 WL 1875587, at *4 (M.D. Tenn. 2006) (slip op.) (citing *Allen v. Mich. Dept. of Corrs.*, 165 F.3d 405, 413 (6th Cir. 1999)); *see also Randolph*, 453 F.3d at 737 (finding "other indicia of retaliation" where a plaintiff who had engaged in protected activity was then herself investigated by the defendant employer against whom she complained).

Here, the plaintiff, who engaged in protected activity, was terminated, while Officer Gray, who apparently did not, was only reprimanded. While the defendants claim that the plaintiff's termination was due only in part to his alleged violation of the sick leave policy, the plaintiff maintains that he never violated the policy. (*See* Docket No. 25 at 9.) Instead, he maintains, he called in sick because his doctor instructed him to do so, and he made the call in a manner that comported with his department's custom and practice.

Keeping in mind the plaintiff's light burden at this stage of the *McDonnell Douglas* analysis, *see Nguyen*, 229 F.3d at 563, the court finds that the close temporal proximity between the plaintiff's protected activity and his termination, when combined with evidence that the

17

plaintiff was treated more harshly than Officer Gray and investigated despite his doctor's instructions that he not attend work on July 3, 2004, suffice to create a genuine issue of material fact as to the existence of the requisite causal connection. As such, the plaintiff has demonstrated a *prima facie* case of retaliation.

> 2. *The defendants have advanced a legitimate, nondiscriminatory reason for their actions.*

Once a plaintiff has established a *prima facie* case of retaliation, the burden of producing some legitimate, nondiscriminatory reason for the action falls on the defendant. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Williams*, 132 F.3d at 1131. This is a burden of production; while the defendant "need not persuade the court that it was actually motivated by the proffered reasons," he must raise "a genuine issue of fact as to whether [he] discriminated against the plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 666 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 254). In making this showing, the defendant must "clearly set forth . . . the reasons for the plaintiff's rejection," and such reasons "must be legally sufficient to justify a judgment for the defendant." *Cline*, 206 F.3d at 666.

The defendants here maintain that they fired the plaintiff because he committed a number of infractions including, but not limited to, his violation of the department's sick leave policy. (*See* Docket No. 25 at 9 (listing three personnel rules that the plaintiff allegedly violated).) It also insinuates that the plaintiff's past disciplinary offenses contributed to its decision. *See id.* (After reviewing the [p]laintiff's entire personnel file, including this past disciplinary offenses, and the [i]nternal [i]nvestigation file regarding this incident . . . Chief Tisdale decided to terminate the [p]laintiff.")

With this assertion, the defendants have demonstrated the necessary legitimate,

nondiscriminatory reason for their actions. The burden now falls to the plaintiff to demonstrate that this reason is a mere pretext for the defendants' retaliation against him. *See Burdine*, 450 U.S. at 255.

> 3. *The plaintiff has demonstrated that a genuine issue of material fact exists as to whether the defendants' reasons for his termination were mere pretext for improper retaliation.*

To demonstrate that his employer's explanation is pretextual, a plaintiff must show, by a preponderance of the evidence, the following: (1) that the proffered reasons had no basis in fact; (2) that the reasons did not actually motivate the employer's actions; or (3) that the reasons were insufficient to motivate the employer's actions. *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1084 (6th Cir. 1994). "A blanket denial that the employer's articulated reasons for [taking an adverse action against an employee] . . . were incorrect . . . is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987). If the plaintiff demonstrates that the defendant's proffered, nondiscriminatory reason is a pretext, then the fact finder may infer unlawful retaliation. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 345-46 (6th Cir. 1997).

Although the plaintiff does not attempt to fit his demonstration of pretext into the *Manzer* format, he appears to argue that the defendants' proffered reasons for his termination had no basis in fact. Specifically, he alleges that undisputed evidence demonstrates that he did not violate the sick leave policy and that, as such, the defendants' reasons for firing him lack merit. (*See* Docket No. 34 at 21 ("[The plaintiff] contends that if . . . there was no abuse of the sick leave policy[,] there is no basis for disciplinary action with regard to his use of sick leave and[,]

19

therefore[,] no basis to consider any prior discipline to resolve this matter.").)

The defendants claim that the plaintiff's termination resulted primarily from his violation of the following policies: (1) Personnel Rule XVI 3.15, which prohibits abusing sick leave or making misleading statements about it; (2) Gallatin Police Department Directive 3.3.1, which states that an employee who is unable to report to work due to illness or other emergency should contact his supervisor at least two hours before his shift is scheduled to begin; and (3) Gallatin Police Department Directive 3.4.2, which requires all employees to answer all questions related to their scope of employment and to the police department's operations. (*See* Docket No. 25 at 9-10; Docket No. 28 at 1.)

The plaintiff has raised genuine issues of material fact about whether he violated these policies. For instance, he claims that he had been ordered by his doctor not to attend work on July 3 and that he was, therefore, being truthful when he called in sick to work that day. (*See* Docket No. 34 at 6; Docket No. 35-5 at 224.) He also asserts that he complied with departmental policy and practice when he contacted his shift supervisor two hours before his shift was to begin and informed him that he would not be attending work. Finally, he specifically disputes the defendants' contention that he failed to answer the questions posed to him during the investigation of the July 3 incident. (*See* Docket No. 36 ¶ 52 ("Plaintiff did not refuse [to] answer any questions and wanted to [be] cooperative despite the situation."); Docket No. 34 at 7 (indicating that the plaintiff participated in "several minutes" of interviewing and that he explained to Thrasher that he had been under a doctor's care on July 3, thus revealing that he answered at least some of the questions that were put to him).)

With these specific factual assertions, the plaintiff has substantiated his argument that the

20

defendants' proffered reasons for his termination were factually false. *Cf. Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (noting that a plaintiff's unsubstantiated denial of a defendants' articulated legitimate reason is insufficient to withstand a motion for summary judgment). A genuine issue of material fact exists as to whether the plaintiff violated all three of these policies.

In particular, it is for a fact-finder to determine whether the plaintiff, in fact, abused the sick leave policy, as he had explicit directions from his physician not to attend work on July 3 and specific permission from him to participate in the Nashville Police Department's testing. Additionally, a factual question exists as to whether the plaintiff violated the third directive, as his whereabouts on his sick day may not fall under the rubric of an employee's "scope of employment" or "the police department's operations." While courts should refrain from second-guessing managerial decisions in general, they are charged with determining whether those decisions evince retaliation. *See Hatsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons.")

As such, the court finds that the plaintiff has demonstrated that a reasonable jury could find that the defendants' proffered reasons for his termination were mere retaliation for his protected EEOC activity. Accordingly, summary judgment on this claim will be denied.[6]

_____

[6]The defendants allege that the City Council later examined the circumstances surrounding the plaintiff's firing and independently decided to overturn the decision of the Personnel Board, which had reduced the termination to a thirty-day suspension without pay, and to reinstate his termination. (*See* Docket No. 39 at 7-8.) A fact-finder might later find that this adds credence to the defendants' stated reasons for the plaintiff's termination, but it is not enough to defeat, at this stage of the analysis, the plaintiff's creation of a genuine issue of

**B.**     ***The defendants are entitled to summary judgment on the plaintiff's claim that they retaliated against him when they reprimanded him for allegedly submitting a false traffic report and issued negative employment references to his prospective employers.***

The plaintiff claims that the defendants reprimanded him for the accident report in retaliation for his protected EEOC activity.  He also seems to allege that the defendants retaliated against him when they characterized him in a negative light to prospective employers, including the Metropolitan Nashville Police Department.  (*See* Docket No. 34 at 19 ("Apparently not satisfied with terminating his employment, the [d]efendant attempted to do anything he could to sabotage [the plaintiff] and his ability to obtain any other employment in law enforcement.").)

With respect to the first claim, the defendants allege that the plaintiff has failed to demonstrate a causal connection between his protected activity and the reprimand he received. (*See* Docket No. 25 at 20.)  As to the second claim, the defendants take issue with the authenticity and validity of the employment questionnaires submitted by the plaintiff in furtherance of his assertions.  (*See* Docket No. 39 at 7.)  They also emphasize that "not a scintilla of evidence has been presented by the [p]laintiff that his rejection by the Metropolitan Nashville Police Department is related in any manner to the statements attributed to Gallatin Police Department employees in the [e]mployer [q]uestionnaires."  (*See id.*)

Because the plaintiff has not demonstrated a causal connection between his May 6, 2004 EEOC complaints and either the defendants' June 8, 2004 reprimand of the plaintiff or their purportedly negative employment references of July 20, 2004, he cannot establish a *prima facie*

―――――――――――――――――

material fact on this claim.

22

case that either of these actions qualify as retaliation. Although the temporal proximity with respect to these claims is stronger even than that in the plaintiff's retaliatory termination claim, here the plaintiff has put forth no other indicia that the defendants' behavior constitutes retaliation. *See Randolph*, 453 F.3d at 737 (indicating that "temporal proximity itself is insufficient to find a causal connection"). For instance, he has not shown that a similarly situated employee who did not engage in protected activity behaved in the same manner as he did, yet was treated better than he was, nor has he demonstrated that he was perhaps subjected to a needless investigation.[7] *See Randolph*, 453 F.3d at 737; *Cantrell*, 2006 WL 1875587, at *4. As such, no genuine issue of material fact exists as to whether the plaintiff has established a *prima facie* case of retaliation, and the defendants' motion for summary judgment on this claim will be granted.

**V.      The defendants are entitled to summary judgment on both of the plaintiff's hostile work environment claims.**

The plaintiff seems to attempt to establish two distinct hostile work environment claims. First, he alleges that the defendants subjected him to a racially discriminatory hostile work environment when they suspended him for his poor attendance in city court, reprimanded him for

_____

[7]Although the defendants did investigate the circumstances surrounding the plaintiff's submission of an allegedly false accident report, there is no genuine issue of material fact as to whether this investigation was baseless. Even the plaintiff admits that he had not verified the driver of the vehicle when he submitted his accident report, and he does not deny the existence of two voicemail messages from the owner's daughter identifying herself as the true driver of the vehicle.

allegedly submitting a false accident report, and terminated him for violating a number of departmental policies related to him calling in sick on July 3, 2004. (*See* Docket No. 1 ¶ 23; Docket No. 34 at 9.) Next, he appears to claim that the reprimand and the termination also combined to create a retaliatory hostile work environment. (*See* Docket No. 34 at 9 ("[T]hese actions individually and cumulatively created a hostile work environment[,] subjecting [the plaintiff] to retaliation for having participated in a protected activity.").) The court first will address the plaintiff's racially discriminatory hostile work environment claim.

**A.** ***The defendants are entitled to summary judgment on the plaintiff's claim that he was subjected to a racially discriminatory hostile work environment.***

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In order to make out a racially discriminatory hostile work environment claim, a plaintiff must demonstrate the following: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment created a hostile working environment; and (5) his employer has *respondeat superior* liability. *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999); *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).

In order to demonstrate that he was subjected to a hostile work environment, a plaintiff must meet both an objective and a subjective test. He must show that the conduct about which he is complaining was severe or pervasive enough to create an environment that a reasonable person

24

would find hostile or abusive and that, in addition, he subjectively regarded that environment as such. *Bowman*, 220 F.3d at 463 (citing *Harris*, 510 U.S. at 21-22).

A court tasked with deciding if a work environment is objectively hostile or abusive must evaluate the totality of the circumstances presented to it. *Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether–taken together–the reported incidents make out such a case." *Id.* In making such a determination, a court may consider a number of factors, including but not limited to the following: "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The Supreme Court has noted that, in conducting this analysis, "no single factor is required" in order to determine that an employee's work environment was objectively hostile or abusive. *Id.* It has also cautioned courts against overreaching the bounds of Title VII's prohibitions and allowing it to become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The defendants maintain that the plaintiff has not adduced enough evidence to demonstrate that a reasonable person would find his work environment hostile or abusive. (*See* Docket No. 25 at 18.) Importantly, the court must consider only the defendants' race-based conduct in evaluating whether they subjected the plaintiff to an objectively impermissible environment. *See Moore*, 171 F.3d at 1078. Such conduct need not be specifically racial in nature to qualify for consideration. *See Jackson v. Quanex Corp.*, 919 F.3d 647, 662 (6th Cir. 1999). Rather, it can constitute proof of a hostile work environment "if it would not have occurred but for the fact that the plaintiff was African American." *See id.*

25

Here, the plaintiff has failed to demonstrate that any of the events about which he complains, *i.e.*, his suspension, his reprimand, and his termination, took place because of his race. As noted above, he is unable to state a *prima facie* case of discrimination with respect to any of these claims, and he is otherwise unable to put forth any meaningful evidence that they would not have taken place but for his race. Thus, no genuine issue of material fact exists as to whether the plaintiff has demonstrated his subjection to an objectively hostile, racially discriminatory, work environment. Accordingly, the defendants' motion for summary judgment on this claim will be granted.

**B.      The defendants are entitled to summary judgment on any claim that the plaintiff was subjected to a retaliatory work environment.**

Although his pleadings are not entirely clear on this point, the plaintiff seems to claim that his reprimand and his termination combined to create a retaliatory hostile work environment. In order to establish such a hostile work environment claim, a plaintiff must show the following: (1) he is a member of a protected class; (2) he was subject to retaliatory harassment; (3) the harassment was based on his protected activity; (4) the harassment created a hostile work environment; and (5) his employer failed to take reasonable care to prevent and correct any harassing behavior. *See Willey v. Slater*, 20 Fed. App'x 404, 406 (6th Cir. 2001) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir.1999)).

The court need not engage in a factor-by-factor application of this test because, as indicated above, it has found that, while a genuine issue of material fact exists as to whether the plaintiff's termination was retaliatory, no reasonable jury could find that the defendants

26

retaliated against him when they reprimanded him for the allegedly false accident report.[8]  The

termination alone is not enough to evince an objectively retaliatory hostile work environment.

*See Kinamore v. EPB Elec. Util.*, 92 Fed. App'x 197, 206-07 (6th Cir. 2004) (opting not to

determine whether a plaintiff had made out a retaliatory hostile work environment claim where

the events about which the plaintiff in that case complained did not constitute retaliation); *see*

*also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (noting that

"isolated incidents (unless extremely serious) will not amount to discriminatory changes in the

terms and conditions of employment," such as is required to establish a hostile work

environment claim) (internal quotation omitted).  Accordingly, the defendants' motion for

summary judgment on this claim will be granted.


VI.     **No genuine issue of material fact exists as to whether Chief Tisdale is individually**
        **liable for the plaintiff's alleged retaliatory termination.**

        Finally, the plaintiff seeks to hold Chief Tisdale individually liable for the defendant's

alleged THRA violations.  As indicated above, only the plaintiff's retaliatory termination claim

has survived the defendants' motions for summary judgment.

        In order to hold Chief Tisdale himself responsible for the defendants' alleged retaliatory

termination of the plaintiff, the plaintiff must demonstrate that Chief Tisdale aided or abetted an

act declared discriminatory by the THRA.  *See* Tenn. Code Ann. §4-21-301(2) (2005) ("It is a

discriminatory practice for a person . . . to . . . [a]id, abet, incite, compel or command a person to

engage in any of the acts or practices declared discriminatory by this chapter . . . ."); *Carr v.*

_____

        [8]Any finding that a retaliatory termination alone could suffice to show a hostile work
environment would inappropriately create a separate hostile work environment claim for every
plaintiff who alleged his subjection to such a termination.

27

*United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997), *overruled on other grounds by Parker*

*v. Warren County Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999); *Harris v. Dalton*, No. E2000-

02115-COA-R3-CV, 2001 WL 422964, at *3 (Tenn. Ct. App. 2001) ("The Supreme Court has

previously held that there can be no individual liability under [the] THRA unless the individual

aids, abets, incites, compels, or commands the employer to engage in discrimination (accomplice

liability).").

Here, the plaintiff appears to assert that Chief Tisdale aided and abetted the defendants'

retaliation against him because, as the police department's lead decision maker, he decided to

terminate the plaintiff and to appeal the Personnel Board's reduction of his termination to a

thirty-day suspension without pay.

The defendants maintain that Chief Tisdale cannot be individually liable for the

plaintiff's termination because, even if he had retaliatory motives, the City Council's

independent investigation and subsequent decision to reinstate his termination broke the causal

connection between those motives and the defendants' ultimate decision to termination the

plaintiff.

The Sixth Circuit has indicated that a supervisor who is merely acting in fulfillment of

his duties cannot be held individually liable for discrimination under the THRA.  *See Crutchfield*

*v. Aerospace Ctr. Support*, No. 98-6105, 1999 WL 1252899, at *2 (6th Cir. Dec. 14, 1999)

(affirming a district court's grant of summary judgment in favor of an individual defendant on a

THRA claim when the defendant's actions adverse to the plaintiff's employment all were within

the legitimate scope of the defendant's delegated management authority); *see also Jenkins v.*

*Nashville Pub. Radio*, No. 3:02CV109, 2005 WL 3358871, at *7 (M.D. Tenn. Dec. 9, 2005)

(finding that a supervisor did not aid or abet discriminatory acts taken against a plaintiff when he made the decision not to promote her).

Rather, individual liability under the THRA requires an act that is "separate and distinct from acting as a supervisor."  *See* Colette Koby & Tara Fergus, *How to Keep Supervisors from Being Held Individually Liable for Discrimination or Sexual Harassment*, 42-JUL Tenn. B.J. 20 (2006); *see also Hood v. Tenn. Bd. of Regents*, No. 3-04-0473, 2006 WL 2645197, at *10-11 (M.D. Tenn. 2006) (slip op.) (denying summary judgment for individual defendants where they prevented action that could have corrected discriminatory behavior); *Harris v. Dalton,* No. E2000-02115-COA-R3-CV, 2001 WL 422964, at *3-4 (Tenn. Ct. App. Apr. 26, 2001) (finding that a supervisor could be held individually liable for discrimination where he thwarted his employer's investigation into his improper behavior).

The plaintiff here has not alleged that Chief Tisdale took any actions outside the scope of his supervisory duties.  Rather, he bases his complaints against Tisdale on actions that Tisdale took in furtherance of his duties as the leader of the Gallatin Police Department.  Such acts cannot give rise to individual liability under the THRA.  As such, the defendants' motion for summary judgment on the plaintiff's claim that Chief Tisdale is individually liable for the plaintiff's allegedly retaliatory termination will be granted.

## **CONCLUSION**

The plaintiff has failed to create a genuine issue of material fact as to whether the defendants discriminated against him on the basis of his race or subjected him to a discriminatory or retaliatory hostile work environment.  He also has not shown that a reasonable jury could find that the defendants retaliated against him when they reprimanded him for

allegedly submitting a false traffic report or issued negative employment references to his prospective employers. As such, the defendants' motion for summary judgment on each of these claims will be granted. The plaintiff has demonstrated that a genuine issue of material fact exists as to whether his termination by the defendants qualifies as retaliation. He has not shown, however, that Chief Tisdale can be held individually liable for such retaliation if it did take place. Accordingly, the defendants' motion for summary judgment will be denied on the former count and granted on the latter.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge